Willie Mae WALKER, aka Dell Walker, Plaintiff and Appellant,

v.

STATE of Utah, Defendant and Respondent.

No. 16705.

Supreme Court of Utah.

Jan. 23, 1981.

* CROCKETT, Justice, concurred in this case before his retirement.

Richard J. Leedy, Salt Lake City, for plaintiff and appellant.

Robert B. Hansen, Atty. Gen., Craig L. Barlow, Asst. Atty. Gen., Salt Lake City, for defendant and respondent.

MAUGHAN, Chief Justice:

The plaintiff appeals the District Court's judgment denying her petition for a Writ of Coram Nobis or in the alternative a Writ of Habeas Corpus. We reverse the judgment and remand the matter to the District Court for further proceedings in conformity with this opinion. All statutory references are to Utah Code Annotated, 1953, as amended.

The plaintiff Willie Mae Walker, hereinafter "Walker," was originally tried and convicted by a jury of unlawful possession of a controlled substance with intent to distribute for value. On September 26, 1977, the Court entered judgment against the plaintiff, sentenced her to an indefinite term as provided by law, and ordered her commitment to commence forthwith. The plaintiff appealed her conviction to the Utah Supreme Court, which in an unpublished per curiam opinion upheld the conviction.[1]

Following her conviction and our decision on appeal, the plaintiff discovered the fact that during the trial the prosecution was made aware of and failed to disclose certain evidence which Walker contends was favorable to her defense. In order to understand the import of these allegations a brief review of the factual basis for the conviction is necessary.

The plaintiff was initially arrested after the search of a building, owned by her, uncovering a brown prescription bottle

1. *State v. Walker*, Utah, No. 15568, September 5, 1978.

filled with 56 balloons of heroin. The upstairs portion of this building contains three bedrooms which share a common living room area. None of the bedrooms have separate bathroom or kitchen facilities and a common bathroom and washroom are used jointly by the occupants. The upstairs also contains an office-bedroom in which the plaintiff kept the various records of her restaurant business. Only this latter room had functioning locks on its door.

At the time of the search, which was made pursuant to a warrant, Walker was detained by the police in the adjacent restaurant where she was working. After securing the plaintiff the police went upstairs and searched the three bedrooms, one of which was used by the plaintiff as her residence. While upstairs they found Robert Westley, hereinafter "Westley," who was also named in the warrant. A search of Westley uncovered 4 balloons of heroin. Westley was then placed in custody and the search moved to the office-bedroom.

Finding this room locked, the police entered the room by breaking down the door. Once inside they found the prescription bottle containing heroin in a nightstand next to the only bed in the room. They also found in the nightstand two letters addressed to the plaintiff. Other areas of the room contained furs, jewelry, women's clothing, a cash box and business receipts, all of which were identified as belonging to the plaintiff.

After what one of the police officers characterized as a thorough search of the room the plaintiff was read her *Miranda* rights and questioned about the room where

the heroin was found. She was subsequently tried and convicted of possession of a controlled substance with intent to distribute for value in violation of 58–37–8(1)(a)(ii).

Walker's defense at trial was grounded upon the premise that Westley had use and control of the room in question. The plaintiff argued Westley was using the room as his residence prior to and at the time of the search. In support of this contention the plaintiff testified Westley had clothing and toiletry articles in the room at the time of the search.

During the trial the plaintiff also denied making a post-arrest statement testified to by the police in which she allegedly indicated she had exclusive control over the locked room and possessed the only key to that room.

In contravention to the plaintiff's defense, the prosecuting attorney, Spencer Austin, elicited testimony from two of the officers present at the time of the search and arrest to the effect that no men's clothing or toiletries were found in the locked room.[2] The prosecuting attorney later referred to this testimony and the lack of any evidence corroborating the plaintiff's defense in his closing argument and final summation to the jury.[3]

However, after the trial and appeal, the plaintiff became aware of evidence known by the prosecution which supported her contention that Westley had access to and actually occupied the room in question.

---

**2.** On direct examination Officer Michael George explained:
  A. Yes, I completed the search of this room.
           *     *     *     *     *     *
  Q. What if any did you observe in men's clothing or men's articles in that room?
  A. There were no men's articles in that room.
  During cross-examination by the plaintiff's attorney Officer George further explained:
  A. I searched practically the whole room, yes, Sir.
  Q. Did you find in any closet by the window clothing of Robert Westley?

  A. There was no male clothing found in that bedroom.
  Officer Randall Anderson's testimony was of similar import.

**3.** In his closing argument the prosecutor stated: "He (Sheriff's Deputy Michael George) made a further search of that room after Deputy Anderson had, and what did he testify that he found? Women's clothing . . . . He testified that he found perfume, jewelry and different types of women's clothing. I would submit to you that that's possession of that particular heroin. Who else was using that room?"

In an affidavit accompanying the plaintiff's Petition for Relief, Ophelia Buford, who worked at the plaintiff's restaurant at the time of the search, explained the police had asked her to come upstairs and take possession of jewelry and money found in the locked room. Once upstairs she asked if they were going to take Westley to jail in his pajamas. When questioned about the location of his clothes, she, according to her affidavit, explained they were in the locked room where he had been sleeping. She further explained in the affidavit that Sheriff's Deputy Duncan then entered the room with Westley where certain articles of clothing belonging to the latter were found in diverse areas of the room.

During the Habeas Corpus-Coram Nobis proceeding, Sheriff's Deputy Duncan confirmed the fact that after arresting Westley he accompanied him into the office-bedroom where Westley's clothes were located. Furthermore, at the petition hearing the prosecuting attorney, Spencer Austin, testified that Sheriff's Deputy Duncan informed him during the second day of the trial of the existence of the clothes in the room.

The District Court's findings of fact relating to the Petition for Relief acknowledged the existence of this undisclosed evidence concerning the presence of Westley's clothing in the room containing the heroin. The findings also credited the prosecution with knowledge of this evidence on the second day of the trial and, thus, at the time of his closing argument. The findings also stated the prosecuting attorney did not, at the time of his initial discovery, nor at any later time, disclose this evidence to the plaintiff or her counsel.

Thus, in the present case, the prosecuting attorney solicited testimony from two of the officers present during the search of the building. This testimony indicated the room in which the heroin was found did not contain men's clothing. Furthermore, the testimony was in direct conflict with the position advocated by the plaintiff. Whether or not the prosecution was aware of the fact this testimony was incorrect at the time it was given, he was later made expressly aware of that fact during the course of the trial. Yet, the prosecuting attorney failed to disclose the contradicting testimony to the plaintiff or the court, and instead deliberately relied on the false impression created by the original testimony in both his closing argument and summation to the jury.

It is an accepted premise in American jurisprudence that any conviction obtained by the knowing use of false testimony is fundamentally unfair and totally incompatible with "rudimentary demands of justice." [4] The proposition is firmly established that a conviction obtained through the use of false evidence known to be such by representatives of the State, must fall under the due process clause of the Fourteenth Amendment [5] and Article I, Section 7, of the Utah State Constitution, if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.[6] The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears.[7] This standard derives from both the prosecutorial misconduct and more importantly the fact that the use of false evidence involves a corruption

4. See *Giglio v. United States*, 405 U.S. 150, 153, 92 S.Ct. 763, 765, 31 L.Ed.2d 104 (1972), quoting from *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935).

5. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959); see also *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Miller v. Pate*, 386 U.S. 1, 87 S.Ct. 785, 17 L.Ed.2d 690 (1967); *Alcorta v. Texas*, 355 U.S. 28, 78 S.Ct.

103, 2 L.Ed.2d 9 (1957); *Pyle v. Kansas*, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942).

6. See *Giglio v. United States*, supra, 405 U.S. note 4, at 153, 92 S.Ct. at 765, quoting from *Napue*, supra, *note 5*, 360 U.S. at 271, 79 S.Ct. at 1178; see also *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

7. See *State v. Jarrell*, Utah, 608 P.2d 218 (1980).

of the truth seeking function of the trial process.[8]

In a similar manner the prosecution's reliance on the false impression created by the testimony of the two police officers also represents a corruption of the truth seeking function of our criminal trial process.

■ We have previously stated that the State while charged with vigorously enforcing the laws "has a duty to not only secure appropriate convictions, but an even higher duty to see that justice is done."[9] In his role as the State's representative in criminal matters, the prosecutor, therefore, must not only attempt to win cases, but must see that justice is done.[10] Thus, while he should prosecute with earnestness and vigor, it is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[11]

In the present instance the State's case against the plaintiff is based on circumstantial evidence. The heroin was not found on the person of the plaintiff or in her living quarters. Instead, the heroin was found in a separate room which the plaintiff used as an office. The position advocated by the State imputed possession of the heroin to the plaintiff because of her control over the room in which it was found. In support of that position the State introduced police testimony crediting the plaintiff with a post arrest statement in which she allegedly stated she had exclusive control of that room and the only key to its locked door.

The police testimony concerning the absence of any men's clothing in the room was presented in direct support of this testimony and the prosecution's case and in direct contravention of the plaintiff's contentions.[12]

This latter testimony which was allowed to stand uncorrected by the prosecution created the false impression that no men's clothes were found in the room at the time of the search. Although the prosecution was aware of the false character of that testimony, he did nothing to correct the false impression created in the minds of the jury. Rather, he expressly relied on this false impression in his closing arguments. It is possible that the prosecution's misleading statements relating to this issue and his manipulation of the evidence had an effect on the jury's determination.[13]

■ The false impression which the prosecution knowingly fostered in the present case constitutes prosecutorial misconduct which seriously interferred with the trial court's truth seeking function. We believe this to be analogous to the prosecution's knowing use of false testimony and therefore subject to the same standard of materiality used in those cases.

■ Applying this standard to the present case, we believe there exists a reasonable likelihood the false impression fostered by the prosecutor could have affected the judgment of the jury.

Therefore, the prosecution's actions have deprived the defendant of a fair trial[14] and

---

8. Id., at 225.

9. See *Codianna v. Morris*, Utah, 594 P.2d 874, 877 (1979).

10. Cf. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).

11. *State v. Adams*, Utah, 583 P.2d 89, 91 (1978).

12. For example, in her defense, the plaintiff challenged the police testimony relating to her post arrest statement and the search of the room. The testimony of Deputy Duncan which was not disclosed by the prosecution would have added direct support to the plaintiff's position that Westley had use and control of the

room. Equally important, revelation of the false character of the police testimony relating to the occupancy of the room inferentially supports the plaintiff's position regarding her post arrest statement by impugning the credibility of those witnesses. See *Napue v. Illinois*, supra, note 5, 360 U.S. at 269, 79 S.Ct. at 1177.

13. See *Donnelly v. DeChristoforo*, supra note 5, 416 U.S. at 647, 94 S.Ct. at 1873.

14. As we explained in *State v. Jarrell*, supra note 7, at 225; "The overriding concern in cases involving the prosecutorial nondisclosure ... (and more importantly prosecutorial misconduct) is the defendant's right to a fair trial."

constitute a denial of due process. As we explained in *State v. Jarrell*, "In a criminal trial it is essential that evidence which tends to exonerate the defendant be aired as fully as that which tends to implicate him."[15] In the present case this has not occurred and the defendant is entitled to have that error rectified.[16]

The judgment of the District Court is therefore reversed and the case remanded for a new trial.

STEWART and CROCKETT,* JJ., concur.

WILKINS, J., heard the arguments but resigned before the opinion was filed.

HALL, Justice (dissenting):

The statutory provision [1] which bears upon the propriety of granting a new trial on the basis of newly-discovered evidence reads, in pertinent part, as follows:

> When a verdict or decision has been rendered against the defendant the court may, upon his application, grant a new trial in the following cases only:
>
> *    *    *    *    *    *
>
> (7) When new evidence has been discovered, material to the defendant and which he could not with reasonable diligence have discovered and produced at the trial.

The matter of granting or refusing to grant a new trial is within the sound discretion of the trial judge and this Court will reverse his decision thereon only where he has abused that discretion.[2] I do not agree that the trial judge in the instant case has abused his discretion.

The "new evidence" relied upon relates to the officer's knowledge of the existence of men's clothing in the office-bedroom in which the heroin was found. Although the prosecution did not disclose such evidence, the record is clear that it was equally acces-

sible to Walker at the time of trial. *It is undisputed that Walker was present with Officer Duncan when Westley obtained clothing from the room on the night of his arrest.* At the hearing on the writ (herein appealed), Officer Duncan testified that to the best of his recollection he entered the room with Walker and Westley and that Walker opened the closet and procured the clothes for Westley. Ophelia Buford, appearing as a witness on behalf of Walker, disputes some of that testimony, but not the presence of Walker. Buford testified as follows:

Q. Do you recall when Robert Westley was getting dressed?

A. Yes.

Q. When [they] took him into Room 6 [the upstairs room in which the heroin was found] and had him change from his pajamas into—.

A. Yes.

Q. Where was Mrs. Walker at that time?

A. She was upstairs.

Q. Was she in the room?

A. Yes.

Q. Did she get a key to open the closet?

A. No.

Q. How did she get into the closet?

A. They broke it open.

At trial, Officer Duncan took the witness stand, but was never asked by the defense on cross-examination whether he saw any men's clothing in Room 6. Walker herself testified and denied having exclusive control over the room but apparently never informed her attorney of the incident now relied upon in this proceeding. In light of the foregoing, the officer's knowledge of the existence of men's clothing in the room cannot be construed to be newly-discovered evidence.

---

15. *State v. Jarrell*, supra note 7, at 225.

16. Cf. *Codianna v. Morris*, supra note 9, at 877.

* Crockett, Justice, concurred in this case before his retirement.

1. U.C.A., 1953, 77–38–3.

2. *State v. Bundy*, Utah, 589 P.2d 760 (1978).

Even assuming, *arguendo*, that such evidence was "newly discovered," it still must be shown that Walker could not with reasonable diligence have discovered and produced it at trial. In his closing argument at the hearing, Walker's attorney concedes that "perhaps there could have been more diligence in obtaining that type of evidence," but that he did not anticipate the need for that defense. It is his contention that "it came as a complete surprise to me when these officers testified that Mrs. Walker stated that she had 'sole and exclusive control' over Room 6." However surprised counsel may have been, certainly it cannot be said that Walker was similarly surprised if the testimony of Buford is to be believed that Walker was present in Room 6 when the clothing was taken therefrom for Westley. Had Walker apprised her counsel of that fact, he would have had an opportunity to meet the issue at trial, either by more appropriate cross-examination of the State's witnesses, or by producing further defense witnesses, notably, Buford. Reasonable diligence simply has not been demonstrated.

In any event, the trial court concluded that, although corroborative of Walker's position at trial, the prosecutor's undisclosed evidence would not have changed the decision of the jury.

The main opinion makes reference to the case of *United States v. Agurs.*[3] In that case, the Court declared that the rule of *Brady v. Maryland*[4] arguably applies in three quite different situations: (1) where the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew or should have known of the perjury; (2) where there is a pretrial request for specific evidence and the prosecution suppresses the information; and (3) where the defense either makes no request or merely makes a general request for exculpatory material, and certain favorable material is not volun-

tarily supplied by the prosecutor. The instant case involves no perjury and clearly falls within the third situation. *Agurs* held that under the third situation, the appropriate standard to be applied is as follows:

... [I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed. This means that the omission must be evaluated in the context of the entire record. If there is no reasonable doubt about guilt whether or not the additional evidence is considered, there is no justification for a new trial. On the other hand, if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt.

The role of the trial court in making a determination as to the effect of non-disclosed evidence was articulated in *Cannon v. State of Alabama.*[5] In the instant case, the trial court properly relied upon that case in its ruling:

The Court has reviewed the transcript of the evidence. The Court has read the cases submitted.

And there is no question that, in the Court's mind, that the County Attorney's Office failed to disclose the fact that the men's clothing was contained in the room wherein the heroin was found.

However, in reviewing the cases and in reviewing the transcript of the trial, the Court endeavored to approach it the same as was done in the case of *Cannon v. State of Alabama*, and approached the reading of the testimony and the evidence from the point of view of a factfinder in connection with the matter.

\*   \*   \*   \*   \*   \*

Now, with the background, and with what the evidence would appear to a finder of fact, the Court has concluded that the evidence would have been somewhat corroborative of the defendant's po-

---

3. 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976).

4. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), dealing with the suppression by the

prosecution of evidence favorable to an accused.

5. 558 F.2d 1211 (5th Cir. 1977).

**694**

sition in the matter, but that the fact that the clothing in the room, and the fact that the defendants put on evidence both the heroin found in the possession of Mr. Westley in the room and that in the room appeared to be the same, would not have been matters that would have changed the fact-finders [sic] decision in connection with the matter and would not have weighed heavily in connection with the fact finder as far as the court can determine.

Therefore, the Petition for Coram Nobis and/or In the Alternative Habeas Corpus will be denied.

The narrow question the trial court was called upon to answer was this: Did the omitted evidence that Duncan saw Westley get a pair of pants from a closet in the room where the heroin was found create a reasonable doubt as to Walker's guilt? At trial, there was ample evidence that Westley had access to the room. Walker testified that Westley would go into the room for periods of time when he had headaches. Westley was also found to have the same type of heroin on his person at the time of arrest as was found in the room. On the other hand, it is undisputed that numerous items of personal property which belonged to Walker were also discovered in the room. At trial, the court specifically instructed the jury that ownership of the controlled substance need not be exclusive—it may have been jointly owned. Although the men's clothing found in the room may have corroborated Walker's theory of the case, it is not, as phrased by the trial court, "material" to Walker's conviction in a constitutional sense.

I would affirm.